BENJAMIN B. WAGNER
United States Attorney
JEFFREY A. SPIVAK
Assistant U. S. Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>APPROXIMATELY $47,495.00 IN U.S. CURRENCY,<br><br>　　　　　Defendant. | 1:14-MC-00076-LJO<br><br>CONSENT JUDGMENT OF FORFEITURE |

　　　　Pursuant to the Stipulation for Consent Judgment of Forfeiture, the Court finds:On or about May 27, 2014, the Drug Enforcement Administration (hereafter "DEA") seized Approximately $47,495.00 in U.S. Currency (the "Defendant Currency").

　　　　2.　　The DEA commenced administrative forfeiture proceedings, sending direct notice to all known potential claimants and publishing notice to all others.  On or about August 26, 2014, the DEA received a claim from Dady Lu Thongthipvoravong ("Thongthipvoravong" or "Potential Claimant") asserting an ownership interest in the Defendant Currency.

　　　　3.　　The United States represents that it could show at a forfeiture trial that:

　　　　　　a.　　On May 27, 2014, DEA agents received information regarding suspicious travel by Thongthipvoravong, who was traveling from Los Angeles, California to

1

Consent Judgment of Forfeiture

Fresno, California via American Airlines flight 2610 on the same date. DEA agents were also advised that Thongthipvoravong's travel had originated in Dallas, Texas and that the round trip air ticket has been purchased on the day prior (May 26, 2014) with a return date of May 29, 2014.

  b. After arrival of flight 2610, DEA agents and additional law enforcement made contact with Thongthipvoravong as he exited the plane. Thongthipvoravong was subsequently contacted by two law enforcement officers. When asked about the nature of his travel to Fresno, Thongthipvoravong advised that he was originally from Fresno and was visiting family. When asked for the names of the family members he was visiting Thongthipvoravong was reluctant to provide that information. Thongthipvoravong then stated that he would be visiting friends, but again was reluctant to provide the names or any additional information with regard to the individuals he planned to visit.

  c. Upon further questioning, Thongthipvoravong advised that there was nothing of an illegal nature in his bag or on his person. When initially asked if he was carrying any large sums of currency, Thongthipvoravong did not respond. When asked a second time if he was carrying any large sums of currency, Thongthipvoravong stated that he was carrying "some" money and gave consent for law enforcement to search his bag.

  d. Upon searching the bag, law enforcement agents located a blue zipper pouch with the word "Chase" written on it and another black zippered "binder" type container. When asked what was in the blue pouch, Thongthipvoravong, stated that it was his money. After opening the blue pouch law enforcement agents observed an unknown amount of rubber banded U.S. currency inside. Thongthipvoravong stated that this was all the U.S. currency he had in his possession. While Thongthipvoravong made this statement, law enforcement observed the black zippered "binder" type container to be open and to contain a large unknown amount of currency which was also bundled with rubber bands.

  e. At this point, one of the law enforcement agents removed the black "binder" type container, containing a large amount of U.S. currency and showed it to

2

Consent Judgment of Forfeiture

Thongthipvoravong.  When asked about his statement wherein Thongthipvoravong stated that the money in the blue "Chase" pouch was all he had in his possession, he did not respond.

    f.   When asked why he was carrying such a large amount of currency, Thongthipvoravong stated that he did not believe in banks.   Thongthipvoravong advised that he was a professional gambler and that he had W-2s from casinos which proved that the money was his.  At this point law enforcement explained to Thongthipvoravong that he was free to leave but that his bag and currency would being detained while a narcotic detecting canine was called to conduct a sniff test on the currency.  Thongthipvoravong advised that he desired to stay with his bag and money; and again stated that he was a professional gambler and had W-2s to prove this was how he had obtained the money. Thongthipvoravong susbsequently produced the W-2s as well as other financial-type documents which law enforcement copied for their records.

    g.   During contact with Thongthipvoravong, law enforcement observed his cell phone ringing repeatedly.  When asked if someone was picking him up in Fresno, Thongthipvoravong refused to respond.

    h.   Over the course of the interview Thongthipvoravong responded to questions regarding his travel plans, stating that he was here in Fresno to see some people, to gamble at Table Mountain Casino, and that he planned to go to Las Vegas.  When asked where he intended to stay, Thongthipvoravong stated that he would be staying at hotels and with friends; however, he was unable to provide the names of these hotels or the names of his friends.  When asked how he intended to get to Las Vegas and then back to Fresno in time to make his return flight, Thongthipvoravong indicated that he might not utilize the return flight.

    i.   Thongthipvoravong was very reluctant to answer questions other than how he had obtained the money in his possession.  When asked if he had ever been arrested or if he had ever been on probation, Thongthipvoravong remained silent refusing to answer either of these questions.

   j. At approximately 10:17 p.m., a controlled sniff of the currency was conducted wherein narcotic detecting canine "Tag" made a positive alert on the money for the presence of narcotics.

   k. In 2008 Dady Lu Thongthipvoravong pleaded guilty to transportation of marijuana and drug paraphernalia in Yavapai County Arizona, Superior Court.

  4. As a result of the foregoing, the United States believes it could show at a forfeiture trial that the Defendant Currency is forfeitable to the United States pursuant to 21 U.S.C § 881(a)(6).

  5. Without admitting the truth of the factual assertions contained above, Thongthipvoravong specifically denying the same and for the purpose of reaching an amicable resolution and compromise of this matter, Thongthipvoravong agrees that an adequate factual basis exists to support forfeiture of the Defendant Currency. Thongthipvoravong hereby acknowledges that he is the sole owner of the Defendant Currency and that no other person or entity has any legitimate claim of interest therein. Should any person or entity institute any kind of claim or action against the government with regard to its forfeiture of the Defendant Currency, Thongthipvoravong shall hold harmless and indemnify the United States, as set forth below.

  6. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1345 and 1355, as this is the judicial district in which acts or omissions giving rise to the forfeiture occurred.

  7. This Court has venue pursuant to 28 U.S.C. § 1395, as this is the judicial district in which the Defendant Currency was seized.

  8. The parties herein desire to settle this matter pursuant to the terms of a duly executed Stipulation for Consent Judgment of Forfeiture.

Based upon the above findings, and the files and records of the Court, it is hereby ORDERED AND ADJUDGED:

  9. The Court adopts the Stipulation for Consent Judgment of Forfeiture entered into by and between the parties.

10. Upon entry of this Consent Judgment of Forfeiture, $27,495.00 of the Approximately $47,495.00 in U.S. Currency, together with any interest that may have accrued on the total amount seized, shall be forfeited to the United States pursuant to 21 U.S.C. § 881(a)(6), to be disposed of according to law.

11. Upon entry of the Consent Judgment of Forfeiture, but not later than 60 days after the Court issues the Consent Judgment of Forfeiture or 60 days after Potential Claimant has provided the necessary electronic funds transfer paperwork—whichever is later, $20,000.00 of the Approximately $47,495.00 in U.S. Currency shall be returned to Thongthipvoravong through his attorney Angel Mata.

12. The United States of America and its servants, agents, and employees and all other public entities, their servants, agents, and employees, are released from any and all liability arising out of or in any way connected with the seizure or forfeiture of the Defendant Currency.  This is a full and final release applying to all unknown and unanticipated injuries, and/or damages arising out of said seizure or forfeiture, as well as to those now known or disclosed.  Thongthipvoravong waived the provisions of California Civil Code § 1542.

13. No portion of the stipulated settlement, including statements or admissions made therein, shall be admissible in any criminal action pursuant to Rules 408 and 410(a)(4) of the Federal Rules of Evidence.

14. All parties will bear their own costs and attorneys' fees.

15. Pursuant to the Stipulation for Consent Judgment of Forfeiture filed herein, the Court enters a Certificate of Reasonable Cause pursuant to 28 U.S.C. § 2465, that there was reasonable cause for the seizure of the above-described defendant currency.

IT IS SO ORDERED.

Dated:  **July 20, 2015**               **/s/ Lawrence J. O'Neill**
                                        UNITED STATES DISTRICT JUDGE